737 F.2d 1311
 PIEDMONT DISTRIBUTING COMPANY, INC., Appellant,
v.
PEARL BREWING COMPANY, a foreign corporation, Appellee.
PIEDMONT DISTRIBUTING COMPANY, INC., Appellee,
v.
PEARL BREWING COMPANY, a foreign corporation, Appellant.
 Nos. 82-2007(L), 82-2008.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 5, 1984.
Decided July 5, 1984.
 
 Kenneth A. Richstad, Columbia, S.C. (Emil W. Wald, Spencer & Spencer, Rock Hill, S.C., Kermit S. King, King & Cobb, Columbia, S.C., on brief), for appellant/cross-appellee.
 Terry S. Bickerton (Cox & Smith Inc., San Antonio, Tex., Melvin McKeown, Spratt, McKeown & Spratt, York, S.C., on brief), for appellee/cross-appellant.
 Before SPROUSE and CHAPMAN, Circuit Judges, and WARRINER,* District Judge.
 SPROUSE, Circuit Judge:
 
 
 1
 Piedmont Distributing Company, Inc. (Piedmont), a beer wholesaler and distributor in Rock Hill, South Carolina, brought this diversity action against Pearl Brewing Company (Pearl), a major beer brewery headquartered in San Antonio, Texas, contending that Pearl breached its contractual duty to sell beer to Piedmont for distribution in the area of Rock Hill, South Carolina. The dispute arose as a consequence of Piedmont's former owners' decision to sell the company to Bob Beaty, Piedmont's current owner. For a number of reasons, including its belief that the Piedmont ownership change had not been in accordance with state law, Pearl stopped delivery on a shipment of beer ordered by Piedmont prior to the sale for delivery after the sale.
 
 
 2
 The district court, after a bench trial, found that Pearl had breached the contract and awarded damages to Piedmont in the amount of $19,355. Both Pearl and Piedmont appeal, Pearl contending, among other things, that it did not terminate the contract, and Piedmont contending that the damages awarded are insufficient. We agree that Pearl did not terminate the contract, reverse, and remand with instructions that judgment be entered for Pearl.
 
 
 3
 * Pearl and Piedmont executed the distributorship contract in controversy here in 1961. Troy Garrison was Piedmont's principal owner from March 10, 1961 until June 30, 1979. During the eighteen years of Garrison's ownership, an amicable and profitable relationship apparently existed between Piedmont and Pearl. Garrison, however, had considered selling his ownership interest in Piedmont on several occasions before 1979, deciding ultimately in each instance to continue his ownership of the business. Over the years, officials at Pearl thus had become accustomed to Garrison's vacillations on selling his business. In the spring of 1979, however, Garrison finally resolved to sell Piedmont and on June 30 of that year sold the company to Bob Beaty.
 
 
 4
 Neither Garrison, Beaty, nor any Piedmont official formally notified Pearl of the intended Garrison/Beaty sale until two weeks after it was consummated. A Piedmont employee, however, informally advised Paul Rice, a Pearl salesman, that Garrison was engaged in negotiations to sell Piedmont. Rice left a one-page distribution application with Piedmont with instructions that Piedmont's prospective new owner submit it to Pearl for approval before the sale. Beaty, however, delayed sending the application to Pearl's headquarters in San Antonio until some time[1] after the June 30 sale took place. The application required a current financial statement which Beaty did not supply. Moreover, it was submitted in Beaty's name and contained no reference to the Piedmont distributorship Beaty had purchased. Pearl's management denied Beaty's application on August 1.
 
 
 5
 Negligent administrative action on the part of the South Carolina Alcoholic Beverage Control Commission (ABCC) further complicated the dealings between Piedmont and Pearl. Piedmont, as required by state law, applied to the ABCC for approval of Garrison's sale of the business to Beaty. The ABCC approved the ownership change, but ABCC personnel misfiled the application and approval documents. In mid-July, a rumor began circulating within the state beer industry that the Piedmont ownership change had not been in compliance with state law. After Pearl inquired about this rumor to the ABCC,[2] the Commission issued a Rule to Show Cause directing Piedmont to explain its apparent failure to conform to appropriate state statutes. An administrative hearing was scheduled for August 23, 1979, but on that date ABCC personnel discovered the misfiled materials and cancelled the Rule to Show Cause and hearing.
 
 
 6
 While it was still owned and operated by Garrison, Piedmont had placed an order for a shipment of beer to be delivered on an unspecified date. Upon discovery on July 5 of the sale of Piedmont to Beaty and of Beaty's failure to apply to them for a continuance of the distributorship, Pearl ordered that this shipment be delayed. On August 1, Piedmont contacted Pearl about the delayed shipment; by then, however, Pearl had been informed, albeit wrongly, that the sale to Beaty had not been in conformity with state law and Pearl continued its refusal to ship the delayed order. In mid-August Piedmont's attorneys contacted Pearl, informed it that the sale had been perfectly legal, and demanded shipment. Three weeks after the ABCC's August 23 determination that the transfer had in fact been proper, Pearl advised Piedmont that it stood ready to ship the delayed order either upon payment in advance or on credit if Beaty furnished certain financial data. Piedmont's counsel responded that it was no longer interested in doing business with Pearl due to this lawsuit, which had been filed August 28.II
 
 
 7
 The 1961 distributorship contract between Pearl and Piedmont purports to give either party the right to terminate the brewer-distributorship relationship at any time for any reason. This termination provision, however, is significantly modified by a provision of South Carolina's beer wholesaler franchise statute regulating the business of beer distribution in that state and incorporated in all distributorship agreements. S.C.CODE ANN. Sec. 61-9-1010(1)(b). Despite any contractual language to the contrary, a distributorship contract cannot be cancelled by a brewer in the absence of just cause or without providing the distributor sixty days' notice of cancellation.[3] Any proposed sale of a distributorship must be approved in advance by the ABCC; if it is so approved, the brewer must honor the sale or exercise a statutory option to purchase the distributorship if it does not desire to do business with the prospective new owner.[4] Because Pearl was not formally notified of the proposed sale of Piedmont by Garrison to Beaty, it had no opportunity to submit an offer to buy as allowed by section 61-9-1040(1).
 
 III
 
 8
 The district court recognized correctly that South Carolina law protects beer distributors from arbitrary, unfair terminations of their distributorship contracts by registered beer producers. Piedmont Distributing Co. v. Pearl Brewing Co., No. 79-1745, slip op. at 39-41 (D.S.C. May 21, 1982). Not only does section 61-9-1010(1) specifically prohibit such terminations, but South Carolina common law has long recognized a cause of action for a contract termination that is "contrary to equity and good conscience." See, e.g., deTreville v. Outboard Marine Corp., 439 F.2d 1099, 1100 (4th Cir.1971); Philadelphia Storage Battery Co. v. Mutual Tire Stores, 161 S.C. 487, 159 S.E. 825, 826 (1931). The court concluded in this case "as a matter of law that defendant breached its contract with plaintiff." Piedmont, supra, slip op. at 39. It apparently rested this legal conclusion upon its finding that Pearl refused to ship the delayed order of beer. It also found no evidence that this "termination" was in good faith, and, consequently, that Pearl "breached its contract by termination." Id. at 45.
 
 
 9
 We find clearly erroneous the district court's factual conclusion that the delay of shipment was unreasonable and against "equity and good conscience." More important, we disagree that the refusal to ship amounted to a termination of the distributorship contract.
 
 
 10
 It is not clear from the trial court's opinion whether the court found a wrongful termination due to Pearl's delay in shipping the beer during the entire period after July 5, or ruled only that Pearl was in breach after August 23. Some language in the opinion suggests that the trial court concluded that the delay from July 5 to August 23 was based on reasonable business considerations and therefore was not actionable. In any event, the court plainly believed that Pearl had an unequivocable statutory obligation to resume shipment on the delayed order once it discovered on August 23 that the ownership change had proceeded in accordance with state laws. We disagree. It is true that Pearl could not lawfully terminate Piedmont's franchise solely because of the ownership change. The applicable statutes, however, did not require Pearl to deliver on credit a valuable shipment of beer to a company whose new owner had consistently refused to furnish financial statements or other materials from which his credit rating could be ascertained. The record reveals that from the time Beaty submitted his application to become a Pearl distributor in mid-July until Pearl's September 15 offer to ship on a cash basis, Beaty never supplied Pearl with any significant financial documents--though he did furnish another producer, the Miller Brewing Company,[5] with such information. There is no evidence that Beaty ever indicated his willingness to pay cash for the long-delayed shipment. Under these circumstances, the post-August 23 delay was reasonable and certainly did not evidence Pearl's bad faith towards Piedmont or Beaty.
 
 
 11
 Furthermore, we cannot agree with the district court that the delay, even if wrongful, ripened into a termination of the franchise agreement. During the final three-week period in controversy, for example, Pearl took no steps that would indicate it considered its contractual relationship with Piedmont at an end. Significantly, it made no effort to find another distributor for its products in the Rock Hill area during that interval. Pearl's conduct can be likened at worst to breach in connection with a single delivery on an installment contract, which does not in the ordinary case constitute a breach of the whole. See S.C.CODE ANN. Sec. 36-2-612. Given the problems stemming from the ABCC's negligence, Piedmont's failure to notify Pearl of the impending sale or submit a distributorship application, Beaty's refusal to supply relevant financial data, and Pearl's attempt in September to restore its pre-sale relationship with Piedmont, we cannot concur in the district court's conclusion that Pearl, by refusing to deliver a single order, unlawfully terminated its contract with Piedmont. We hold the district court's finding on this point to have been clearly erroneous.
 
 
 12
 For the reasons set out above, we reverse the judgment entered in Piedmont's favor and remand with instructions that a judgment be entered for Pearl.
 
 
 13
 REVERSED AND REMANDED, WITH INSTRUCTIONS.
 
 
 
 *
 Hon. D. Dortch Warriner, District Judge, sitting by designation
 
 
 [1]
 The record is unclear on when Beaty submitted this application to Pearl, and the trial court made no specific finding as to when Pearl received the Beaty application. At trial, he contended that he had mailed the application to San Antonio on July 9, but Pearl denied receiving that submission. In any event, Beaty unquestionably mailed another application on July 23, which Pearl acknowledges it had received and denied by August 1. Beaty's handling of Piedmont's relationship with Pearl differed markedly from his dealings through Piedmont with Miller Brewing Company, another brewer whose products Piedmont marketed. See footnote 5 infra
 
 
 [2]
 Piedmont's contention on appeal that this constituted an "abuse of administrative process" is wholly meritless
 
 
 [3]
 S.C.CODE ANN. Sec. 61-9-1010 provides in pertinent part:
 (1) It shall be unlawful for any [registered] producer ... or any other officer, agent or representative of any registered producer:
 * * *
 (b) To unfairly, without due regard to the equities of such beer wholesaler, or without just cause or provocation, to cancel or terminate any agreement or contract, written or oral, or franchise, or any contractual franchise relationship ... to sell beer manufactured by the registered producer ... provided, further, however, notice of intention to cancel such agreement or contract, written or oral, or franchise or contractual franchise relationship shall be given in writing at least sixty days prior to the date of such proposed cancellation or termination. Such notice shall contain (i) assurance that the agreement or contract, written or oral, or franchise or contractual franchise relationship is being terminated in good faith and for material violation ... and (ii) a list of the specific reasons for the termination or cancellation.
 
 
 [4]
 S.C.CODE ANN. Sec. 61-9-1040(1):
 Except as hereinafter provided, any proposed sale of an interest in the business carried on by any beer wholesaler which under the laws of this State would require that the purchaser obtain a permit to operate as a beer wholesaler shall be subject to the approval of the purchaser by the Alcoholic Beverage Control Commission as an applicant for a permit authorizing the sale of beer. If the applicant of such prospective purchaser for such permit is approved, it shall be unlawful, notwithstanding the terms, provisions or conditions of any contract, written or oral, or the franchise agreement between such beer wholesaler and the registered producer, for any registered producer to fail or refuse to approve the aforedescribed transfer or change of ownership; provided, further, that in the case of any proposed sale with respect to which the purchaser has been approved by the Alcoholic Beverage Control Commission, the registered producer shall have the right to require that the interest in the business carried on by the beer wholesaler be transferred to the registered producer upon the same terms and conditions as such interest would have been transferred to the prospective purchaser. If the registered producer shall not, within sixty days after receipt of notification by certified mail of such proposed sale, notify the beer wholesaler by certified mail of the exercise of such right by the registered producer, such right may not thereafter be exercised.
 
 
 [5]
 Indeed, Beaty early during his negotiations with Garrison evidenced his intention to end Piedmont's contractual relationship with Pearl. In order to obtain a closer business relationship with Miller, Beaty advised Miller that if it approved Piedmont's application to become a Miller distributor, Piedmont would agree to distribute Miller product lines on an exclusive basis. Beaty submitted a detailed application and financial statement to Miller to assist Miller in making its financial decision whether to award Beaty d/b/a Piedmont a Miller franchise. Miller tentatively approved Beaty's application on June 8, well before the transfer of ownership took place. Its approval was conditioned on his obtaining all necessary state and federal licenses once the sale was consummated. Miller's final approval of Beaty as new owner came on July 20